**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ADAM BAKER, as Personal Representative
to the Estate of ZACHARY BARELA

        Plaintiff,

v.                                No.

CORIZON HEALTH, INC.,
and JOHN/JANE DOE,

        Defendants.

**COMPLAINT FOR THE RECOVERY OF DAMAGES**
**CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS, NEGLIGENCE, SPOLIATION**
**OF EVIDENCE AND WRONGFUL DEATH**

      Plaintiff, Adam Baker, the duly appointed Wrongful Death Personal Representative of

Zachary Barela, deceased, by and through his attorneys, Coyte Law, P.C. (Matthew Coyte) and

the Law Office of Matthew Vance, P.C. (Matthew Vance and Lisa Schatz-Vance), brings this

complaint for violations of his civil rights under the Eighth and Fourteenth Amendments to the

Constitution of the United States. Plaintiff also brings claims under the New Mexico Wrongful

Death Act.  In support of this Complaint, Plaintiff alleges the following:

**JURISDICTION AND VENUE**

1.  Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. §§ 1331, 1343

and 42 U.S.C. §§ 1983 and 1988.

2.  This Court also has supplemental jurisdiction over the state law claims alleged pursuant to

28 U.S.C. §1367.

3.  The acts complained of occurred exclusively within Doña Ana County, New Mexico.

4.  Venue is proper in this District as Defendants are residents of New Mexico under 28 U.S.C.

§ 1391 and all of the acts complained of occurred in New Mexico.

**PARTIES**

5.  Plaintiff Adam Baker, as Personal Representative to the Estate of Zachary Barela, is an individual and resident of Santa Fe County, New Mexico.

6.  Plaintiff Adam Baker was duly appointed in the State of New Mexico Third Judicial District Court as Personal Representative to the Estate of Zachary Barela for the purposes of maintaining a claim for damages arising out of the wrongful death of Zachary Barela under the Wrongful Death Act.

7.  Zachary Barela was an inmate in the custody and care of the Doña Ana County Detention Center (hereinafter "DACDC") from October 19, 2017, until his death on August 28, 2019.

8.  DACDC is a detention center in which inmates are primarily accused of a criminal offense and awaiting trial.

9.  While incarcerated, Zachary was completely dependent upon DACDC for his care and well-being.

10. During all material times Defendant Corizon Health, Inc. (hereinafter "Corizon") was responsible for providing medical care to inmates at DACDC pursuant to a contract with the Board of Commissioners for Doña Ana County to fulfill its constitutional obligation to provide healthcare in DACDC during the time period relevant to Plaintiff's complaint.

11. Defendant Corizon is a Delaware for Profit Corporation registered to do business in New Mexico.

12. At all material times, Defendant Corizon acted through its owners, officers, directors, employees, agents, or apparent agents including, but not limited to, administrators, management, nurses, doctors, technicians, and other staff responsible for their acts or omissions pursuant to the doctrines of respondeat superior, agency or apparent agency.

13. At all material times, Defendant John/Jane Doe (hereinafter "Doe") was employed by Defendant Corizon as a medical professional.

14. Defendant Doe was acting under the color of state law and within the scope of his/her employment at all material times.

15. Defendant Doe is being sued in his/her individual capacity only.

16. At all relevant times, Defendant Corizon employed and exercised direct supervisory control over Defendant Doe, who was acting under the color of state law within the scope of their duties and employment as an agent of Corizon.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

17. Plaintiff restates all previous allegations as if restated herein.

18. On or about April 1, 2016, the Board of Commissioners for Doña Ana County (hereinafter "Board") selected, approved, and entered into a written contract with Defendant Corizon entitled "Doña Ana County Contract for Goods and Services" (hereinafter "Agreement"). That agreement remained in effect at the time of these events.

19. Under the Agreement, the Board represented that the health care provided to inmates at DACDC would comply with all current and any future standards issued by the National Commission on Correctional Health Care ("NCCHC") and the American Correctional Association ("ACA").

20. Zachary Barela was booked into the DACDC on October 19, 2017.

21. Throughout his time at DACDC, Zachary was a pretrial detainee.

22. While incarcerated, Zachary was completely dependent upon DACDC for his care and well-being.

23. Medical records indicate that Zachary was treated for multiple chronic medical conditions, including hypertension, hyperlipidemia, chronic pain, bipolar disorder, and depression.

24. Medical records indicate that Zachary's chronic medical conditions were managed through daily prescriptions, including lisinopril, simvastatin, omeprazole, and amlodipine.

25. Both hyperlipidemia and hypertension are serious risk factors for the development of atherosclerotic cardiovascular disease.

26. Due to his chronic medical conditions, Zachary routinely sought medical care while at DACDC according to the medical records.

27. Medical records indicate that Zachary was seen periodically at the chronic care clinic for his hypertension and hyperlipidemia.

28. Medical records indicate that Defendant Centurion and Doe knew Zachary had serious medical conditions which required ongoing monitoring.

29. On July 16, 2019, Zachary was seen by Chetan Shivaram, DDS, because he had been complaining of tooth decay and experiencing periodontitis ("bleeding gums") for months.

30. People with periodontitis have a greater risk of experiencing major cardiovascular events, such as heart attacks and strokes.

31. Zachary's risk was even greater because he also had hyperlipidemia.

32. Bleeding of the gums is a common symptom indicative of heart disease and is linked to heart attacks and stroke.

33. On August 27, 2019, Zachary sought medical attention because he was experiencing severe chest pain.

34. Zachary knew that experiencing severe chest pain was serious because his father had recently been hospitalized with heart issues.

4

35. The severe chest pain was a clear and obvious sign of a potential heart attack.

36. This was especially true because according to his medical chart, Zachary had a history of hypertension, hyperlipidemia, and was a cigarette smoker.

37. Defendant Doe was on duty at the medical unit on August 27, 2019.

38. Zachary reported his severe chest pain to Defendant Doe.

39. Upon information and belief, Zachary described a heavy chest squeezing and a burning feeling that radiated to his left arm.

40. Defendant Doe was familiar with Zachary and his medical history.

41. Defendant Doe knew Zachary was being treated for hypertension and hyperlipidemia.

42. Defendant Doe knew that chest pain was a symptom of a serious medical condition.

43. Defendant Doe knew that chest pain accompanied by a burning sensation that radiated down the left arm are symptoms of a serious medical condition.

44. Defendant Doe refused to conduct an examination and did not even take Zachary's blood pressure or pulse.

45. Defendant Doe did not arrange for Zachary to receive an electrocardiogram (hereinafter "EKG") to evaluate his heart.

46. Despite Zachary's ongoing symptoms and pain, Defendant Doe refused to provide any treatment or to examine him.

47. Instead of examining Zachary, Defendant Doe ignored Zachary's chest pain, an obvious sign of a serious medical condition, and instructed him to return to his cell.

48. Zachary returned to his cell still suffering from severe pain and emotional distress from Defendant Doe's refusal to provide him with any medical care.

49. As time passes for someone experiencing a heart attack who is not treated it can lead to serious complications, including death.

50. Minutes matter. Prompt action can save lives.

51. Emergency rooms encounter heart attacks as a matter of routine.

52. Nitroglycerin, catheterization, stent placement, and surgery are usually required to treat the condition.

53. The symptoms of a heart attack are well known in the medical community.

54. Defendant Doe knew that chest pain of this type could be fatal if left untreated.

55. Any competent medical provider would have realized Zachary's symptoms required immediate emergent medical attention.

56. It would have been obvious to any lay person that Zachary needed to be examined by a medical professional and transported to the emergency room for a higher level of care.

57. The following day, August 28, 2019, Zachary continued to suffer from chest pain.

58. That evening, correctional officer Mario Macias was assigned to B1 pod as the direct supervision officer where Zachary was housed in cell 203.

59. The pod was on lockdown because razors had been distributed to the detainees in their cells.

60. The following events were captured by the B1 dayroom security camera and incident reports.

61. At 10:20 pm, officer Macias was on the second tier collecting razors just steps away from cell 203, where Zachary was housed.

62. While on his bunk, Zachary suddenly felt unwell and immediately walked over to the toilet and began vomiting.

63. Within seconds, at 10:21 p.m., Zachary collapsed to the floor and began convulsing.

64. Cellmate, Manuel Gomez, moved quickly to help Zachary and turned him on his side.

65. Another cellmate, Estanislao Casarez, activated the emergency/panic call button to notify the master control station.

66. No correctional officer responded to the panic call.

67. Only seconds later, Mr. Casarez ran to the cell door and began calling for help through the cell's window while banging and kicking the door to get the attention of Mr. Macias.

68. Officer Macias heard the sounds coming from cell 203, but instead of immediately responding to the medical emergency, he motioned with his hand to wait and continued to collect razors from cell 201.

69. In response to being told to wait, Mr. Casarez continued to bang on the window, but officer Macias motioned again to wait.

70. Officer Macias was just feet away from where Zachary had collapsed.

71. It was now 10:22 p.m.

72. Mr. Casarez returned to check on Zachary and discovered that he was no longer conscious as his body continued to jerk violently.

73. Mr. Gomez continued to activate the panic button in an attempt to get help.

74. Mr. Casarez ran to the cell door a second time, banging and kicking the door again to get officer Macias' attention.

75. Zachary's need for medical attention had become so obvious that inmates in the adjacent cell were banging on the door to notify officer Macias that Zachary was experiencing a medical emergency.

76. Officer Macias ignored the pleas for help, motioned with his hand again to wait, and continued to collect razors.

77. Finally, at 10:23 p.m., officer Macias approached cell 203, however because the door was locked, he had to wait for correctional officer, Rauldel Yanez, to remotely open the door from the station desk located downstairs.

78. Upon entering the cell, officer Macias observed Zachary lying on the floor, his body shaking uncontrollably, and vomiting.

79. Officer Macias reported on the radio a "Code Mary."

80. A "Code Mary" signifies an immediate medical emergency and notifies supervisory personnel at DACDC, as well as medical staff employed by Defendant Corizon.

81. By the time the Code Mary was called, Zachary had been lying on the floor, convulsing and vomiting, for approximately two minutes.

82. In his incident report, officer Macias reported that Zachary had stopped seizing and moved him onto his side when he began vomiting again.

83. Correctional officer Yanez was the second officer to arrive.

84. Both officers Yanez and Macias reported that Zachary was "intermittently breathing and throwing up."

85. At approximately 10:24 p.m. Defendant Corizon medical staff, Heather Barela, RN, Sandra Villegas, LPN, Jennifer Revels, LPN, and Alejandra Contreras, medical clerk, entered the B1 dayroom.

86. A tragic, but preventable series of events followed.

87. Since Zachary's cell was on the second floor, the medical cart remained downstairs with Ms. Contreras.

88. Nurses Villegas and Revels entered cell 203 at approximately 10:25 p.m.

89. Nurse Barela, as the charge nurse, began providing direction when she arrived.

90. Nurse Revels exited to run downstairs to get the oxygen tank.

91. Nurse Villegas assessed that Zachary did not have a pulse.

92. Nurse Barela noted Zachary's face was blue, he was periodically gasping for air, and confirmed that he did not have a pulse.

93. Zachary needed to be transported to the nearest emergency room, but 911 would not be called for another seven minutes.

94. If Zachary collapsed in any place other than a jail, he would have been transported immediately to the nearest emergency room.

95. It would be obvious to any lay person that Zachary needed to be transported to the emergency room for a higher level of care.

96. Zachary was suffering from cardiac arrest.

97. Outside the cell, Ms. Contreras tossed the nasal cannula tubing upstairs to Nurse Revels.

98. At 10:27 p.m. Nurse Revels exited the cell, ran downstairs, and returned with the bag valve mask known as an "AMBU bag."

99. Nurses Barela and Villegas attempted to administer CPR but discovered that Zachary's airway was blocked.

100. Because his airway was blocked, the AMBU bag failed to deliver air to Zachary's lungs.

101. Seconds later, Nurse Revels exited the cell again to run downstairs to get the suction device.

102. During this time, Ms. Contreras was unraveling the electrical cord attached to the medical cart.

103. Over the next minute or so, there were multiple attempts to throw the electrical cord up to Nurse Revels to plug into the suction device.

104. Ms. Contreras gave the other end of the cord to Sergeant Solis to plug into the outlet adjacent to the station desk.

105. Nurse Revels caught the cord on the third attempt and re-entered the cell with the suction device.

106. The time was now 10:29 p.m.  Four minutes had elapsed since Nurses Barela and Villegas determined that Zachary had stopped breathing.

107. A heart attack occurs when the blood flow that brings oxygen to the heart muscle is severely reduced or cut off completely.

108. The heart muscle needs oxygen to survive.

109. Upon discovering the suction device was not working, Nurse Revels exited the cell twice to instruct Ms. Contreras to turn the power on from the medical cart.

110. Unfamiliar with the medical cart, Ms. Contreras could not locate the power switch.

111. Two correctional officers also attempted to help Ms. Contreras.

112. At 10:30 p.m. Nurse Revels ran downstairs again to try to solve the problem.

113. Nurse Revels then grabbed the automated external defibrillator device (hereinafter "AED") and returned to cell 203.

114. During this time, Nurse Villegas also exited the cell to instruct Ms. Contreras to remove the electrical cord from the medical cart.

115. Nurse Revels handed the AED to Nurse Villegas who then re-entered the cell.

116. Seconds later, a correctional officer ran upstairs and entered cell 203 carrying an orange-colored emergency medical box.

10

117. Nurse Revels then pulled up the spool of electrical cord to switch out the ends and sent the cord back down to Ms. Contreras to plug into the medical cart.

118. At 10:31 p.m. Nurse Revels re-entered the cell with the suction device.

119. Emergency personnel received the 911 call at 10:31:58 p.m.

120. Eleven minutes had passed since Zachary collapsed.

121. Beginning at 10:34:34 p.m., the following was captured on handheld camera footage by Sergeant Pakinkis.

122. Nurses Villegas and Barelas rotated administering chest compressions while Sergeant Moore applied the AMBU bag to deliver oxygen to Zachary.

123. Zachary's airway remained blocked by vomit and other fluids.

124. For patients in cardiac arrest, seconds count.

125. Responding to a cardiac arrest requires careful coordination.

126. Compressions must be started immediately, and the airway must be secured.

127. Suctioning is a cornerstone of secondary treatment for patients in cardiac arrest.

128. Since Zachary's airway was compromised, suctioning was critical.

129. Emergency medical equipment, including the suction device, is vital to the successful administration of CPR.

130. According to its own policies and procedures, Defendant Corizon is responsible for ensuring mobile emergency equipment are available and checked regularly.

131. On August 28, 2019, Nurse Barela was the charge nurse responsible for checking the emergency equipment.

132. Nurses Revels and Villegas struggled to get the suction device to work.

133. At one point, Nurse Revels stated that "it's on, it's on.  It's not working, it's not sucking."

134. Because the suction device was not working, Zachary's airway remained blocked.

135. Since Zachary's airway was blocked, the AMBU bag was unable to effectively deliver oxygen into his lungs.

136. The camera footage shows that when the AMBU bag is applied, fluid sprayed out from under the mask.

137. At 10:36 p.m., the AED detected an irregular heart rhythm and administered its first shock to Zachary.

138. When a person suffers a sudden cardiac arrest, their chance of survival decreases by 7% to 10% for each minute that passes without defibrillation.

139. When the shock is delivered fluid comes out from Zachary's mouth.

140. Nurse Barela resumed chest compressions followed by Sergeant Moore who was administering the AMBU bag.

141. Significant fluid again comes out from Zachary's mouth.

142. Zachary's airway was still blocked.

143. Nurse Villegas took over chest compressions but performed the procedure incorrectly and had to be instructed by Nurse Barelas where to correctly place her hands.

144. Because the AMBU bag was not working properly since Zachary's airway was blocked, Nurse Villegas requested that the nose cannula be placed on Zachary to deliver oxygen.

145. Just then one of the nurse's states "This shit sucks."

146. Sergeant Moore takes over chest compressions and a deputy with the Las Cruces Sheriff's Department applies the AMBU bag.

147. Nurses Barela, Villegas and Revels complained that none of the pharmacy nurses responded to help.

148. At 10:38 p.m. the AED announced to stop CPR to analyze Zachary's heart rhythm. No heartbeat is detected and CPR resumes.

149. During this time, Defendants Villegas and Revels continued to try to get the suction device to work.

150. Defendant Revels reports that "it is on finally" however when she inserts the tube into Zachary's mouth it does not suction.

151. Defendant Villegas says, "it's fucking not working."

152. Subsequent attempts to suction fluids from Zachary's airway were unsuccessful.

153. At 10:41 p.m. the AED announced to stop CPR to analyze Zachary's heart rhythm. No heartbeat is detected and CPR resumes.

154. The Las Cruces Fire Department (hereinafter "LCFD") and AMR personnel arrived on scene.

155. Finding that Zachary had no pulse, emergency personnel continued with CPR efforts.

156. Their initial impression was that Zachary was in respiratory arrest.

157. An IV was started and they placed a monitor on him.

158. The monitor showed Zachary was asystole.

159. According to the video evidence, emergency personnel, including LCFD, asked Defendant Corizon's medical staff for information regarding Zachary's medical history and known allergies.

160. Defendant Corizon's medical staff were unable to provide Zachary's medical history or known allergies.

161. According to the video evidence, emergency personnel requested that Zachary's medical history be retrieved because the on-site AMR paramedic would need the information when they report to the off-site doctor.

162. The video shows Nurse Barela exiting the cell and instructing Defendant Corizon medical staff to gather Zachary's "medical information, medications; anything on him, and print it up."

163. Because Zachary's airway was blocked, emergency personnel ventilated Zachary.

164. LCFD, AMR and correctional staff rotated every two minutes with chest compressions.

165. Defendant Corizon medical staff obtained Zachary's medical information and reported to the emergency personnel that he was being treated for hypertension and hyperlipidemia.

166. Defendant Corizon medical staff also reported that "apparently he (Zachary) was having chest pain yesterday."

167. The Las Cruces Fire Department's records also indicated that Defendant Corizon's medical staff reported that "the day before in the detention center the patient (Zachary) was seen for chest pain but did not disclose treatment of the patient (Zachary)."

168. At 11:11pm, CPR efforts were stopped.

169. Video evidence of this event has been preserved.

170. Had Zachary been treated when he first presented to Defendant Doe with chest pains, life-saving surgical intervention could have been performed.

171. By denying medical care to Zachary, Defendant Doe allowed Zachary to needlessly suffer extreme pain and anxiety as he experienced life threatening chest pains and unnecessary pain and suffering.

172. Had Defendant Doe provided adequate medical care the day before, Zachary would not have unnecessarily endured pain and suffering by Defendant Corizon's medical staff.

173. By denying medical care to Zachary, Defendant Doe prevented Zachary from obtaining the urgent medical care that would have saved his life.

**COUNT I:**
**INADEQUATE MEDICAL CARE IN VIOLATION OF THE**
**FOURTEENTH AMENDMENT**

174. Plaintiff restates each of the preceding allegations as if fully stated herein.

175. As a pretrial detainee, Zachary had a right to adequate medical care that was protected by the Eighth and Fourteenth Amendments to the Constitution of the United States.

176. The Eighth Amendment prohibits cruel and unusual punishment against persons in state custody serving a prison sentence. The substantive component of the Fourteenth Amendment's Due Process Clause provides similar protections to pretrial detainees. These protections encompass a constitutional duty to provide such persons with timely access to necessary medical care and to refrain from unnecessary, wanton infliction of pain.

177. Zachary's medical needs as described above, as well as his pain and suffering, were sufficiently serious and obvious to warrant protection under the Eighth Amendment, or under the Fourteenth Amendment's Due Process Clause if he is considered a pretrial detainee.

178. Defendant Doe knew that Zachary was diagnosed with serious medical conditions, including hypertension and hyperlipidemia, making him a high risk for potential cardiac complications.

179. Defendant Doe knew that Zachary was suffering from chest pains and could possibly die if his chest pains remained untreated.

180. Defendant Doe knew chest pain was an obvious sign of a serious medical condition, including a possible heart attack.

181. Because Zachary had no control over his confinement, Defendant Doe had an absolute duty to care for and ensure Zachary's well-being and safety.

182. Defendant Doe knew that Zachary could not seek medical care without his/her assistance.

183. Defendant Doe knew that Zachary was not capable of calling 911 from inside the jail.

184. When Zachary requested help for his chest pains Defendant Doe knew he/she was a gatekeeper to his medical care.

185. Defendant Doe knew he/she had an obligation to assess Zachary's chest pains the moment he arrived in the medical unit.

186. Defendant Doe knew it would be potentially disastrous to wait until the next day to address Zachary's complaints of chest pain.

187. Defendant Doe knew he/she had the ability to get an EKG for Zachary to help diagnose the chest pains.

188. Defendant Doe knew he/she could arrange for a higher level of care if he/she was unsure what to do.

189. Defendant Doe deviated from the acceptable standards of nursing and medical care by denying Zachary treatment and access to a higher level of care.

190. Defendant Doe had the ability to keep Zachary in the medical unit to monitor his symptoms to see if they got worse.

191. Defendant Doe knew any medical provider in the community would send a patient with a history of hypertension and hyperlipidemia who was experiencing chest pain to an emergency room for further evaluation.

192. Upon information and belief, Defendant Doe took the unacceptable and deliberately indifferent risk to treat Zachary as if he was faking his serious symptomatology.

193. In an act of deliberate indifference, Defendant Doe disregarded Zachary's chest pain and sent him back to his cell.

194. This allowed Zachary's heart to suffer irreversible damage as he lay untreated in his cell overnight.

195. Defendant Doe's deliberate indifference to Zachary's serious and obvious medical need allowed him to suffer a heart attack which resulted in his premature death.

196. As a proximate and foreseeable result of Defendant Doe's deliberate indifference, Zachary suffered unnecessary pain and suffering, anxiety and emotional distress, up to and including his death.

## COUNT II: NEGLIGENT PROVISION OF MEDICAL CARE

197. Plaintiff restates each of the preceding allegations as if fully stated herein.

198. Defendant Corizon was contracted to provide medical care to inmates housed at DACDC at all times material herein.

199. Zachary was entirely dependent on Defendant Corizon's employees for his medical needs.

200. Defendants Corizon and Doe had a duty to provide Zachary with adequate medical care while incarcerated.

201. Defendants Corizon and Doe breached their duty to provide Zachary with adequate medical care, including through the actions and omissions as described in paragraphs 18 through 173 herein.

202. It was clear to Defendants Corizon and Doe that Zachary was suffering from intense pain and discomfort.

203. Zachary had a variety of serious medical conditions that are known risk factors for heart disease.

204. When Zachary began to experience chest pains and left shoulder pain, the standard of care required that his symptoms be taken as potentially life-threatening.

205. The standard of care required further assessment of his chest pains.

206. If Defendant Corizon's employees were not capable of performing an examination of the cause of Zachary's chest pains, then they had an obligation to arrange for a higher level of care.

207. A reasonable qualified medical professional in the community would have arranged for a diagnostic work-up of Zachary's chest pains.

208. When Zachary requested care for his chest and left shoulder pain, if Defendant Doe was unsure of its causes, he/she had an obligation to call 911.

209. Rather than arrange for any care at all for Zachary's life-threatening symptoms, Defendant Doe chose to send him back to his cell untreated.

210. Defendant Doe breached the standard of care.

211. This breach in the standard of care caused Zachary to lose the opportunity of life saving surgery.

212. This breach in the standard of care resulted in severe damage to Zachary's heart and eventually led to his death.

213. Defendant Corizon had a duty to properly and adequately train its medical staff to respond appropriately to emergency situations.

214. As a result of this breach of duty in care, Zachary needlessly suffered.

215. Defendant Corizon's negligence and the negligence of its employees in responding to Zachary's medical emergency on August 28, 2019, caused needless physical and emotional suffering to Zachary.

216. As a result of Defendants' breach of duty in care, Zachary's life was needlessly shortened, depriving Zachary of a chance of survival.

217. Defendant Corizon is vicariously liable for the acts and omissions of its employees under the theory of respondeat superior.

218. As a proximate and foreseeable result of Defendant Doe's negligence regarding Zachary's serious and obvious medical condition, Zachary suffered injuries, including physical injuries, pain and suffering, emotional distress, and exacerbation of his medical condition, up to and including, death.

**COUNT III: INTENTIONAL AND NEGLIGENT SPOLIATION OF EVIDENCE**

219. Plaintiff restates each of the preceding allegations as if fully stated herein.

220. On August 7, 2020, Plaintiff sent an inspection of public records request to Doña Ana County for all records related to Zachary's death, including his complete medical file.

221. The public records request also sought any and all video footage from August 15, 2019 to August 29, 2019.

222. Plaintiff was not provided with any video evidence for August 27, 2019.

223. The medical records provided contained no mention of a medical visit with Defendant Doe on August 27, 2019.

224. The medical records made no reference to Zachary's request for help with his chest pains on August 27, 2019.

225. In reviewing the records obtained from the Las Cruces Fire Department, Plaintiff learned that a medical encounter actually occurred with Defendants Corizon and Doe prior to his death.

226. According to the Las Cruces Fire Department's records, "[S]taff reported that the day before in the detention center infirmary the patient was seen for chest pain but did not disclose treatment of the patient."

227. In reviewing the video evidence for August 28, 2019, Defendant Corizon medical staff notify emergency personnel, including the Las Cruces Fire Department, that Zachary was seen the day before complaining of chest pain.

228. The video evidence also shows that Nurse Heather Barela instructed a Corizon employee to gather all of Zachary's information, medications, "anything on him," and "print it up."

229. All references to Defendant Doe's interaction with Zachary on August 27, 2019, were either deliberately withheld or destroyed.

230. Zachary's death while in the custody of the Doña Ana County Detention Center placed Defendant Corizon on notice of a potential lawsuit.

231. As such Defendant Corizon had a responsibility to preserve all medical records of Zachary's request for medical help prior to his death.

232. After learning of the potential of the lawsuit, Defendant Corizon disposed of or destroyed records related to Defendant Doe's interaction with Zachary on August 27, 2019, with the sole intent to disrupt or defeat the lawsuit.

233. Defendant Corizon's disposal or destruction of evidence has affected Plaintiff's ability to prove his case and has caused the Plaintiff to suffer damages.

234. Defendant Doe had a duty to document his/her encounter with Zachary on August 27, 2019, when he was requesting help for his chest pains.

235. If Defendant Doe failed to create the medical record contemporaneously with his/her encounter with Zachary, Defendants Corizon and Doe had a duty to supplement the medical record after Zachary died.

236. Defendant Corizon had a duty to maintain and preserve Zachary's medical records.

237. As the jail's medical provider, Defendant Corizon had control over the medical records that were either lost or destroyed.

238. If Defendant Corizon withheld or destroyed evidence to prevent Plaintiff from pursuing a lawsuit, this constitutes both intentional and negligent spoliation of evidence.

239. Plaintiff has suffered damages by this destruction of evidence, including emotional distress and delay in the perfection of this lawsuit.

**JURY DEMAND**

240. Plaintiff restates each of the preceding allegations as if fully stated herein.

241. Plaintiff hereby demands a trial by jury on all counts.

WHEREFORE, Plaintiff requests judgment as follows:

1. All damages that are fair and just pursuant to the laws of the United States and in an amount supported by the evidence presented at trial;

2. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for emotional harm;

3. Punitive damages in an as undetermined amount against the individually named Defendant;

4. Declaring that the acts and practices complained of herein are acts of spoliation;

5.  Sanctions against Defendant Centurion, such as default or the imposition of liability;

6.  Reasonable costs and attorney fees incurred in bringing this action;

7.  Pre- and Post-judgment interest to the maximum extent allowed by law; and for

8.  Such other and further relief as the Court deems just and proper.

Respectfully submitted,

COYTE LAW, P.C.

/s/ Matthew E. Coyte
Matthew E. Coyte
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030
mcoyte@me.com

LAW OFFICE OF MATTHEW VANCE, P.C.

/s/ Lisa Y. Schatz-Vance
Lisa Y. Schatz-Vance
Matthew Vance
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 242-6267
lisa@mattvancelaw.com

*Attorneys for Plaintiff*